**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AMERICAN REGENT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SOMERSET THERAPEUTICS, LLC, SOMERSET PHARMA, LLC, ODIN PHARMACEUTICALS, LLC, RK PHARMA, INC., APOTEX CORP., APOTEX, INC., and ACCORD HEALTHCARE, INC.,<br><br>Defendants. | Case No. 2:24-cv-01022 (BRM) (CLW)<br><br>**OPINION**<br><br>**TEMPORARILY FILED UNDER SEAL** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are applications by Plaintiff American Regent, Inc. ("ARI") and Defendants Somerset Therapeutics, LLC; Somerset Pharma, LLC (together, "Somerset"); Odin Pharmaceuticals, LLC ("Odin"); RK Pharma, Inc. ("RK Pharma"), Apotex Corp., and Apotex, Inc. (together, "Apotex") (collectively, "Defendants") for claim construction to resolve disputes over several claim terms. (ECF Nos. 110–14.) The Court held a claim construction hearing on June 12, 2025. (ECF No. 125.)

This Court has examined the disputes over the construction of these claim terms elucidated in the briefings and at oral argument and, for the reasons set forth in this Opinion, this Court defines the disputed claim terms as follows:

(1) "about 7.41 mg of zinc sulfate or zinc sulfate heptahydrate, about 0.75 mg of cupric sulfate

pentahydrate, about 151 mcg of manganese sulfate or manganese sulfate monohydrate"

means "about 7.41 mg of zinc sulfate or about 7.41 mg of zinc sulfate heptahydrate, about

0.75 mg of cupric sulfate or about 0.75 mg of cupric sulfate pentahydrate, about 151 mcg of manganese sulfate or about 151 mcg of manganese sulfate monohydrate";

(2) "7.41 mg of zinc sulfate or zinc sulfate heptahydrate, 0.75 mg of cupric sulfate or cupric sulfate pentahydrate, 151 mcg of manganese sulfate or manganese sulfate monohydrate" means "7.41 mg of zinc sulfate or 7.41 mg of zinc sulfate heptahydrate, 0.75 mg of cupric sulfate or 0.75 mg of cupric sulfate pentahydrate, 151 mcg of manganese sulfate or 151 mcg of manganese sulfate monohydrate";

(3) "about 2,470 mcg of zinc sulfate or zinc sulfate heptahydrate, about 150 mcg of cupric sulfate or cupric sulfate pentahydrate, about 8.22 mcg of manganese sulfate or manganese sulfate monohydrate" means "about 2,470 mcg of zinc sulfate or about 2,470 mcg of zinc sulfate heptahydrate, about 150 mcg of cupric sulfate or about 150 mcg of cupric sulfate pentahydrate, about 8.22 mcg of manganese sulfate or about 8.22 mcg of manganese sulfate monohydrate"; and

(4) "2,470 mcg of zinc sulfate or zinc sulfate heptahydrate, 150 mcg of cupric sulfate or cupric sulfate pentahydrate, 8.22 mcg of manganese sulfate or manganese sulfate monohydrate" means "2,470 mcg of zinc sulfate or 2,470 mcg of zinc sulfate heptahydrate, 150 mcg of cupric sulfate or 150 mcg of cupric sulfate pentahydrate, 8.22 mcg of manganese sulfate or 8.22 mcg of manganese sulfate monohydrate."

## I.    BACKGROUND

### A.    Factual Background

ARI is a pharmaceutical corporation with a principal place of business in New York State. (ECF No. 86 (Somerset and Odin Compl.) ¶ 2.) ARI has several patents—United States Patent Nos. 11,786,548 ("the '548 Patent"), 11,975,022 ("the '022 Patent"), 11,998,565 ("the '565

Patent"), 12,150,956 ("the '956 Patent"), and 12,150,957 ("the '957 Patent") (collectively, the "patents-in-suit")—as well as New Drug Applications ("NDAs") from the Food and Drug Administration ("FDA") for two multi-trace element injection products, Tralement and Multrys. (*Id.* ¶¶ 1, 26–27; ECF No. 87 (Apotex Compl.) ¶¶ 31–32; ECF No. 88 (RK Pharma Compl.) ¶¶ 21–22.) The patents-in-suit and the related products are directed to providing parenteral, *i.e.*, intravenous, nutrition to patients who cannot adequately absorb nutrients through the digestive tract. (ECF No. 111 at 4.) The patents teach compositions containing multiple trace elements, or elements necessary to certain human metabolic functions at relatively low levels, as well as methods of administering the compositions. (*Id.*) ARI's Tralement and Multrys include trace elements such as zinc, copper, manganese, and selenium. (*Id.*) These products are the first FDA-approved multi-trace element injections, Tralement for patients weighing at least 10 kg, and Multrys for neonatal and pediatric patients weighing under 10 kg. (ECF No. 87 ¶¶ 32, 35.)

Defendants are generic pharmaceutical companies that have submitted Abbreviated New Drug Applications ("ANDAs") to the FDA, seeking approval to sell generic versions of Tralement and Multrys in the United States. (*Id.* ¶¶ 1, 7; ECF No. 88 ¶¶ 1, 11; ECF No. 86 ¶¶ 1, 5.) The litigation underlying the parties' request for claim construction relates to ARI's attempts to prevent the market entry of Defendants' generic versions.

The parties seek construction of terms appearing in the '956, '022, and '548 Patents that describe the quantities of the compounds supplying the trace elements in the injections.[1] (ECF No.

---

[1] The parties have identified several other terms for which ARI proposes a construction, but which Defendants argue are indefinite. (ECF No. 110.) In their Joint Claim Construction and Prehearing Statement, the parties indicated they had agreed to defer issues of indefiniteness until after expert and fact discovery. (*Id.* at 2–3.) While ARI nonetheless provided briefing on its proposed interpretation of these disputed terms (ECF Nos. 111, 113), the Court finds it need not consider indefiniteness at this stage and will honor the parties' agreement to defer consideration of this issue until the case has developed further, which aligns with the practice of courts in this Circuit, *see,*

110 at 6–14.) The '548 Patent teaches the multi-trace element compositions, while the '022 and '956 Patents teach methods of administering the compositions. These terms at issue all follow the same format: "[a quantity in terms of mass (milligrams or micrograms)] of [a sulfate compound] or [a sulfate hydrate compound]." The terms in dispute, and the parties' proposed constructions, are as follows:

| Claim Term | Relevant Patent Claims | ARI's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| "[about] 7.41 mg of zinc sulfate or zinc sulfate heptahydrate, [about] 0.75 mg of cupric sulfate or cupric sulfate pentahydrate, [about] 151 mcg of manganese sulfate or manganese sulfate monohydrate" | '548 Patent, Claims 15, 34, 35; '022 Patent, Claims 12, 14, 15; '956 Patent, Claims 12, 14, 15 | *Plain and ordinary meaning*: "[about] 7.41 mg of zinc sulfate or *an amount of zinc sulfate heptahydrate providing the same amount of zinc*, [about] 0.75 mg of cupric sulfate or *an amount of cupric sulfate pentahydrate providing the same amount of copper*, [about] 151 mcg of manganese sulfate or *an amount of manganese sulfate monohydrate providing the same amount of magnesium*" | "[about] 7.41 mg of zinc sulfate or *[about] 7.41 mg of zinc sulfate heptahydrate*, [about] 0.75 mg of cupric sulfate or *[about] 0.75 mg of cupric sulfate pentahydrate*, [about] 151 mcg of manganese sulfate or *[about] 151 mcg of manganese sulfate monohydrate*" |
| "[about] 2,470 mcg of zinc sulfate or zinc sulfate heptahydrate, [about] 150 mcg of cupric sulfate or cupric sulfate | '548 Patent, Claims 31, 32; '022 Patent, Claims 25, 26, 27; '956 Patent, Claims 26, 27, 28 | *Plain and ordinary meaning*: "[about] 2,470 mcg of zinc sulfate or *an amount of zinc sulfate heptahydrate providing the same amount of zinc*, [about] 150 mcg of | "[about] 2,470 mcg of zinc sulfate or *[about] 2,470 mcg of zinc sulfate heptahydrate*, [about] 150 mcg of cupric sulfate or *[about] 150 mcg of cupric sulfate pentahydrate*, [about] 8.22 mcg of |

*e.g.*, *Sanofi-Aventis U.S. LLC v. Mylan GmbH*, Civ. A. No. 17-9105, 2019 WL 2067373, at *10 (D.N.J. May 9, 2019) ("[T]his Court addresses invalidity disputes, of which indefiniteness is one, at summary judgment or at trial."); *Adapt Pharma Operations Ltd. v. Teva Pharm. USA, Inc.*, Civ. A. No. 16-7721, 2019 WL 1789463, at *4 (D.N.J. Apr. 24, 2019) (deferring decision on an indefiniteness challenge until the presentation of expert testimony); *Par Pharm., Inc. v. Sandoz, Inc.*, Civ. A. No. 18-14895, 2020 WL 1130387, at *8 (D.N.J. Mar. 9, 2020) (same).

| pentahydrate, [about] 8.22 mcg of manganese sulfate or manganese sulfate monohydrate" | | cupric sulfate or *an amount of cupric sulfate pentahydrate providing the same amount of copper*, [about] 8.22 mcg of manganese sulfate or *an amount of manganese sulfate monohydrate providing the same amount of manganese*" | manganese sulfate or *[about] 8.22 mcg of manganese sulfate monohydrate*" |

### B.    Procedural History

ARI initially sued Defendants between February 22, 2024, and March 11, 2024. (ECF No. 1[2]; Civ. A. No. 2:24-01169, ECF No. 1; Civ. A. No. 2:24-02268, ECF No. 1.) On June 12, 2024, ARI's suits were consolidated into this action. (ECF No. 37.) Thereafter, ARI filed First Amended Complaints against Defendants on June 20, 2024 (ECF Nos. 41–44), and Second Amended Complaints on January 3, 2025 (ECF Nos. 85–88). Defendants filed their respective Answers and counterclaims to the Second Amended Complaints on January 24, 2025.[3] (ECF Nos. 91–94.)

Pursuant to Local Patent Rule 4.3 of this Court, the parties submitted a Joint Claim Construction and Prehearing Statement on April 4, 2025. (ECF No. 110.) On April 18, 2025, the parties submitted their respective opening briefs (ECF Nos. 111, 112), and on May 7, 2025, they

---

[2] Unless otherwise stated, ECF document numbers refer to Case No. 24-1022.

[3] Defendants had also filed Answers and counterclaims for the First Amended Complaints on July 11, 2024. (ECF Nos. 51–54.) ARI answered the counterclaims from Somerset, Odin, and Apotex on August 1, 2024 (ECF Nos. 57–59), but moved to dismiss RK Pharma's counterclaims on November 8, 2024 (ECF No. 75). When ARI filed the Second Amended Complaints and RK Pharma filed its amended Answer and counterclaims, ARI renewed its motion to dismiss RK Pharma's counterclaims on February 25, 2025. (ECF No. 102.) The Court reviewed and considered the parties' arguments on this motion and issued a decision granting it in part and denying it in part on August 12, 2025. (ECF Nos. 138, 139.)

submitted their respective responsive briefs (ECF Nos. 113, 114). The Court held a claim construction hearing on June 12, 2025. (ECF No. 125.)

## II.    LEGAL STANDARD

Claims define the scope of the inventor's right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim construction determines the correct claim scope and is a determination reserved exclusively for the court as a matter of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–79 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Indeed, the court can only interpret claims and "can neither broaden nor narrow the claims to give the patentee something different than what [it] has set forth" in the specification. *E.I. Du Pont de Nemours v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1998). A court's determination "of patent infringement requires a two-step process: first, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804 (Fed. Cir. 2007).

This interpretive analysis begins with the language of the claims, which is to be read and understood as it would be by a person of ordinary skill in the art ("POSA"). *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001); *see also Markman*, 52 F.3d at 986 (holding that "[t]he focus [in construing disputed terms in claim language] is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term[s] to mean"); *Phillips*, 415 F.3d at 1312–13. In construing the claims, the court may examine both intrinsic evidence (e.g., the patent, its claims, the specification, and the prosecution history) and extrinsic evidence (e.g., expert reports and testimony). *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

The analysis of claim language begins with determining the "ordinary and customary meaning of a claim term[, which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. Further, the language should not be read solely in the context of the claim under review; instead, it should be analyzed "in the context of the entire patent" and with an understanding of how that language is used in the field from which the patent comes. *Id.* In conducting this review, a different interpretation is placed on a term located in an independent claim than on those located in dependent claims, and it is understood that each claim covers different subject matter. *See Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1331 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1315 (holding that the "presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim")).

In reviewing the language of a patent, "the court starts the decisionmaking process by reviewing the same resources as would [a person of ordinary skill in the art in question], *viz.*, the patent specification and the prosecution history." *Phillips*, 415 F.3d at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). When "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent," understanding claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "In such circumstances, general purpose dictionaries may be helpful" to explain the terms used. *Id.*

Often, however, the ordinary meaning of the claim language is not readily apparent, and in such circumstances, courts look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* Those sources may

include "the words of the claims themselves, the remainder of the specification, the prosecution

history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical

terms, and the state of the art." *Id.* Furthermore, claims must be read in view of the claim

specification, which is of seminal importance in providing framework for understanding the claim

language. As the Federal Circuit explained:

> The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. As we have often stated, a patentee is free to be his [or her] own lexicographer. The caveat is that any special definition given to a word must be clearly defined in the specification. The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.

*Markman*, 52 F.3d at 979–80 (internal citations omitted).

This Court's reliance on the specification is appropriate given the Patent and Trademark

Office's rules requiring "application claims . . . 'conform to the invention as set forth in the

remainder of the specification and the terms and phrases used in the claims must find clear support

or antecedent basis in the description so that the meaning of the terms in the claims may be

ascertainable by reference to the description.'" *Phillips*, 415 F.3d at 1316–17 (quoting 37 C.F.R.

§ 1.75(d)(1)). During this analysis, however, courts should not "import limitations from the

specification into the claims." *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1370 (Fed. Cir.

2008) (quoting *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005)).

The patent's prosecution history is also of "primary significance in understanding the

claims." *Markman*, 52 F.3d at 980. "The prosecution history can often inform the meaning of the

claim language by demonstrating how the inventor understood the invention and whether the

inventor limited the invention in the course of prosecution, making the claim scope narrower than

it would otherwise be." *Phillips*, 415 F.3d at 1317. Further, the prosecution history is also relevant to determining whether the patentee disclaimed or disavowed the subject matter, thereby narrowing the scope of the claim terms. *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1372–73 (Fed. Cir. 2005).[4]

In addition to intrinsic evidence, a court may also rely on extrinsic evidence in interpreting a claim. *Phillips*, 415 F.3d at 1317. Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citations omitted). However, while extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* Extrinsic evidence should be "considered in the context of the intrinsic evidence," as there are flaws inherent in the exclusive reliance on extrinsic evidence, including, *inter alia*, biases, inadvertent alterations of meanings, and erroneous contextual

---

[4] "[I]n certain cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Ventana Med. Sys., Inc. v. Biogenex Lab'ys, Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) (internal citations omitted) (quoting *Phillips*, 415 F.3d at 1316). In such cases, the Federal Circuit interprets the claim more narrowly than it otherwise would in order to give effect to the patentee's intent to disavow a broader claim scope. *Id.* (citing *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319–20 (Fed. Cir. 2006); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342–44 (Fed. Cir. 2001)). However, pointing solely to "general statements by the [patentee] indicating that the invention is intended to improve upon prior art" will not demonstrate that the patentee intended to "disclaim every feature of every prior art device discussed in the 'BACKGROUND ART' section of the patent." *Id.*; *see also Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal."). Moreover, the Federal Circuit has found it "particularly important not to limit claim scope based on statements made during prosecution '[a]bsent a clear disavowal or contrary definition.'" *Digit. Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1273 (Fed. Cir. 2012) (citing *Aug. Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1286 (Fed. Cir. 2011)). The reason for such a stringent rule is "because the prosecution history represents an ongoing negotiation between the PTO and the applicant," and "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Digit. Vending*, 672 F.3d at 1276 (quoting *Phillips*, 415 F.3d at 1317).

translations. *Id.* at 1318–19. Furthermore, extrinsic evidence should not be relied upon where "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

### III. DECISION

In construing the claim terms at issue, the Court must resolve a relatively simple question: what does the word "or" indicate about the quantity of the sulfate hydrate compound taught by the claims? In other words, how much zinc sulfate heptahydrate is meant by "7.41 mg of zinc sulfate *or* zinc sulfate heptahydrate"?[5] *See, e.g.*, '548 Pat., Claims 15, 34–35 (emphasis added). ARI argues one skilled in the art would read this language as an instruction to calculate the amount of zinc sulfate heptahydrate containing the equivalent quantity of elemental zinc as 7.41 mg of zinc sulfate, 13.20 mg. (ECF No. 111 at 9, 30–33.) Defendants disagree and contend, based on the ordinary meaning and function of "or," the proper reading is straightforward: 7.41 mg of zinc sulfate *or* 7.41 mg of zinc sulfate heptahydrate. (ECF No. 112 at 8–12.)

In arguing the claim terms call for the equivalent amount of zinc sulfate heptahydrate, ARI asserts that the '548, '022, and '956 Patents, read as a whole, show "the focus of the claimed invention is on the amount of elemental zinc, copper, or manganese to be given to a patient." (ECF No. 111 at 30.) As evidence, ARI points to the patents' abstracts, which recite "about 800 μg to

---

[5] The terms in dispute teach some quantity of zinc, copper, and manganese supplied in either a sulfate form (zinc sulfate, cupric sulfate, or manganese sulfate) or a sulfate hydrate form (zinc sulfate heptahydrate, cupric sulfate pentahydrate, or manganese sulfate monohydrate). '548 Pat., Claims 15, 31, 32, 34, 35; '022 Pat., Claims 12, 14, 15, 25, 26, 27; '956 Pat., Claims 12, 14, 15, 26, 27, 28. In their briefings and at oral argument, the parties indicated the meaning of the terms in dispute should be the same across all three trace elements and patents-in-suit. Therefore, for ease and consistency, the Court uses zinc and its related compounds, zinc sulfate and zinc sulfate heptahydrate, as well as the quantity (7.41 mg) listed in Claims 15, 34, and 35 of the '548 Patent; Claims 12, 14, and15 of the '022 Patent; and Claims 12, 14, and 15 of '956 Patent. Similarly, as the patents-in-suit share a specification, the Court refers to the pagination of the '548 Patent unless otherwise noted.

about 4,000 µg of zinc, about 40 µg to about 400 µg of copper, . . . or from about 1 µg to about 80 µg of manganese per 1 mL of the injectable composition." (*Id.* (quoting '548 Pat. Abstract).) ARI also contends passages throughout the specifications show elemental zinc, copper, and manganese can be obtained via sulfate salt or sulfate salt hydrate forms, and the specifications also disclose intended dosages of the trace elements that can be so obtained (for zinc, 3 mg). (*Id.* at 30–31.) Additionally, ARI argues the specifications separately recite the respective amounts of zinc sulfate, 7.41 mg, and zinc sulfate heptahydrate, 13.20 mg, needed to obtain 3 mg of zinc. (*Id.* at 31 (citing '548 Pat. col. 22 l. 60–65, Example 11).) ARI finds further support for its reading from extrinsic evidence, including its expert declaration, which it argues shows a POSA would understand the "focus for supplementation would be on the amount of elemental zinc, copper, or manganese supplied by the composition." (*Id.* at 32 (citing ECF Nos. 111-4 (Decl. of Dr. George Phillip Ayers, Pharm.D. (the "Ayers Declaration")) ¶¶ 61–62; 111-17 at ARI_TRAL_MULT-0009035, -0009038; 111-118 at ARI_TRAL_MULT-0008922).)

Defendants' argument is that the ordinary meaning and usage of the word "or" in these claim terms requires applying the numerical value to both the sulfate and sulfate hydrate forms. *i.e.* 7.41 mg of zinc sulfate *or* 7.41 mg of zinc sulfate heptahydrate. (ECF No. 112 at 8–9.) Defendants assert there is nothing about the claims that suggests using a different numeric value for the sulfate hydrate and contend Federal Circuit precedent requires reading "ordinary, simple English words" according to their commonly understood meaning in this situation. (*Id.* (quoting *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004)).) Defendants identify several aspects of the specifications they contend support construing "or" in its customary way, including other "embodiments where the sulfate and hydrated forms are denoted by a single numerical amount and are separated by the conjunction 'or.'" (*Id.* at 10 (citing '548 Pat. at 11:1–

9).) Additionally, Defendants argue ARI's decision during patent prosecution to replace references to ranges of trace elements with the language in dispute here to include "the specific mineral salts or acid of the elemental active ingredients" at specific doses supports its reading and undercuts Plaintiff's view that these claims have an intended focus on the amount of elemental zinc alone. (*Id.* at 11–12 (citing ECF No. 112-1, Ex. F, at 12, 22).) In contrast, Defendants assert ARI's construction asks the Court "to change the ordinary meaning of the claim and insert a conversion" between 7.41 mg of zinc sulfate and a quantity of zinc sulfate heptahydrate containing the same amount of zinc. (*Id.* at 9.) To Defendants, this interpretation would improperly allow ARI to redraft its patent claims, rather than "giv[ing] effect to the terms chosen by the patentee." (*Id.* at 10 (quoting *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999)).) Instead, Defendants argue the Court should follow "settled practice" in the Federal Circuit to "construe the claim as written, not as the patentees wish they had written it." (*Id.* (quoting *Chef Am.*, 358 F.3d at 1374).)

ARI rejects Defendants' proposed construction by arguing it improperly divorces the claim terms from the larger context of the patents-in-suit, as well as a POSA's understanding. (ECF No. 113 at 10 (citing *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011)).) Citing Federal Circuit precedent, ARI asserts its view embraces the "widely accepted canon of claim construction" to construe terms in light of the full specification, viewed as a POSA would. (*Id.* at 8–9 (citing *Immunex Corp. v. Sanofi-Aventis U.S. LLC,* 977 F.3d 1212, 1221 (Fed. Cir. 2020); *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1322–23 (Fed. Cir. 2015); *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004)).) ARI contends Defendants' examples from the specification and file history are unavailing because both indicate an intention to use zinc sulfate and zinc heptahydrate to provide the elemental zinc, and neither contradicts what ARI claims a POSA would understand about converting between sulfate and sulfate hydrate

forms. (*Id.* at 10–12.) Finally, ARI rejects Defendants' reliance on *Chef America* to support their interpretation because ARI argues that, unlike here, there was "no indication that [how the disputed words were used] in this particular conjunction changes their meaning" in that case. (*Id.* at 9–10 (quoting *Chef Am.*, 358 F.3d at 1373–74).) Instead, ARI asserts the specifications clearly indicate "the focus of the claimed invention is on the amounts of elemental zinc, copper, or manganese to be given to a patient," and a POSA would therefore understand the claims to teach an amount of zinc sulfate heptahydrate providing the equivalent amount of elemental zinc as 7.41 mg of zinc sulfate. (*Id.*) At oral argument, ARI also emphasized Defendants had not rebutted the Ayers Declaration or sought to depose Dr. Ayers and generally failed to consider a POSA's viewpoint in their analysis. (ECF No. 132 at 16:17–17:06.)

In response, Defendants argue ARI's interpretation pushes far beyond an informed reading of the specifications to amend them, contrary to the ordinary meaning. (ECF No. 114 at 5.) Defendants provide additional examples from the specifications to demonstrate the inventors used "or" consistently in the common way, including that the specifications define "or" as "generally employed in its sense including 'and/or' unless the content clearly dictates otherwise," which they argue was not the case here. (*Id.* at 9 (quoting '548 Pat. at 6:4–6).) In particular, Defendants note other claims in the patents-in-suit disclose specific amounts of elemental zinc and argue the existence of these other claims makes specious ARI's argument that the claim terms should be read to focus on the amount of elemental zinc, rather than the compounds listed. (*Id.* at 6.) Defendants also refute ARI's notion that the ranges of zinc and other elements disclosed in the abstracts and throughout the specifications indicate an elemental focus requiring a different amount of zinc sulphate heptahydrate, as the "about 800 µg to about 4,000 µg of zinc" disclosed would encompass the amount of zinc contained in 7.41 mg of zinc sulfate heptahydrate. (*Id.* at 7.) Defendants urge

the Court to reject ARI's use of an expert declaration as extrinsic evidence, which is irrelevant in light of the clear meaning based on the intrinsic evidence. (*Id.* at 10.) Because of this, Defendants contended during oral argument there was no need for them to respond to or depose Dr. Ayers because the clear intrinsic evidence meant his statements were not probative. (ECF No. 132 at 21:16–22:13.) Additionally, Defendants highlighted Claim 6 in the '956 Patent to argue ARI's construction would render it redundant, as it teaches a composition comprising 3,000 mcg of zinc (the amount of elemental zinc in 7.41 mg of zinc sulfate) in the form of zinc sulfate or zinc sulfate heptahydrate. (*Id.* at 30:19–31:14.)

Analysis of claim language begins with determining the "ordinary and customary meaning of a claim term" to a POSA, "in the context of the entire patent." *Phillips*, 415 F.3d at 1313. When claim language is ambiguous on its face, a court can consult other intrinsic evidence, including the patent's prosecution history. *Id.* at 1314; *see also Markman*, 52 F.3d at 980. The prosecution history is also relevant to determining whether the patentee disclaimed or disavowed the subject matter, thereby narrowing the scope of the claim. *Seachange Int'l,* 413 F.3d at 1372–73.

"In some cases, the ordinary meaning of claim language may be readily apparent and claim construction will involve little more than the application of the widely accepted meaning of commonly understood words." *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017). When the claim language employs "ordinary, simple English words whose meaning is clear and unquestionable," courts must construe them as written, absent indication otherwise in the intrinsic evidence. *Chef Am.*, 358 F.3d at 1373 (construing the word "to" according to its ordinary usage because there no indication it took on specialized meaning). As a common conjunction, the Federal Circuit has construed the word "or" according to this principle on several occasions. *See Schumer v. Lab'y Comput. Sys., Inc.*, 308 F.3d 1304, 1311 (Fed. Cir. 2002) ("The

proper approach is to construe the claim language [involving 'or'] using standard dictionary definitions, because here, the claims have no specialized meaning. . . . We have consistently interpreted the word 'or' to mean that the items in the sequence are alternatives to each other."); *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) ("These are not technical terms of art, and do not require elaborate interpretation. There is no basis in the specification or prosecution history for reading 'or' as 'and'[.]"); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1280 (Fed. Cir. 2017) (affirming construction of claim describing data "as numbers *or symbols* which have been *taken from the pressure transmitting signal*" to include "a pressure transmitting signal that encodes only non-numerical 'symbols'" based on disjunctive nature of "or").

The patent specifications here do not counsel reading "or" differently than its common English usage. The specification explicitly defines "or" as "is generally employed in its sense including 'and/or' *unless the content clearly dictates otherwise*." '548 Pat. col. 6 l. 4–6 (emphasis added). Therefore, the patentees expressed an intent that "or" be read according to its common meaning, absent clear indication to the contrary. *See, e.g.*, *Vitronics*, 90 F.3d at 1582 ("[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, *as long as the special definition of the term is clearly stated* in the patent specification or file history." (emphasis added)). While ARI argues the overall focus of the patent tells a POSA to consider the total amount of the trace element delivered (and therefore to convert the sulfate form to a hydrate form), it fails to follow the instructions of this definition and identify any claim language that clearly dictates a departure from the common usage. *See Chef Am.*, 358 F.3d at 1373.

As described in *Schumer*, the common use of "or" is to indicate "the items in the sequence are alternatives to each other," 308 F.3d at 1311. Likewise, the common understanding of a phrase in the format "[number] of A *or* B" is that the number applies to A and B as alternatives; for

example, "3 of A or B" communicates that "3 of A" *or*, alternatively, "3 of B" satisfies the phrase. The claim language is no different: "7.41 mg of zinc sulfate *or* zinc sulfate heptahydrate," read according to the common usage of "or," means "7.41 mg of zinc sulfate" *or*, alternatively, "7.41 mg of zinc sulfate heptahydrate."

The Federal Circuit applied a similar reading to claim language in *Wasica*, where the disputed claim term described data displayed "as numbers *or symbols* which have been *taken from the pressure transmitting signal*." 853 F.3d at 1280. The parties disputed whether the claim covered a pressure transmitting signal that conveyed only symbols. *See id.* In affirming the district court's construction, the Federal Circuit noted "[u]sing the disjunctive 'or' as in 'numbers or symbols' designates numbers and symbols as distinct alternatives to one another," to which the phrase "taken from the pressure transmitting signal" applied equally. *Id.* As a result, the court concluded the claim "plainly contemplates a pressure transmitting signal that encodes only non-numerical 'symbols.'" *Id.* The Court sees no reason to read "7.41 mg of" in relation to "zinc sulfate *or* zinc sulfate heptahydrate" any differently than how the Federal Circuit read "taken from the pressure transmitting signal" in relation to "numbers or symbols," as both phrases serve to modify two presented alternatives indicated by the disjunctive "or." *Id.*

The language that ARI asserts conveys the patent's "focus" on delivering trace elements to patients does not negate this obvious reading. Although ARI contends the specification repeatedly teaches ranges of trace element quantities, specifically about "800 µg to about 4,000 µg of zinc," '548 Pat. col. 25 l. 6, this range would apparently include the amount of elemental zinc present in 7.41 mg of zinc sulfate heptahydrate. (ECF No. 114 at 7.) ARI also argues Examples 1, 11, and 12 demonstrate a focus on the "elemental equivalents" between the hydrate and sulfate forms for 3

16

mg of zinc,[6] '548 Pat. col. 42 l. 65–col. 44 l. 8, col. 68 l. 63–col. 71 l. 49, but these examples do not preclude the common reading of the claim terms for two reasons. First, "it is well established that broad claims supported by the written description should not be limited in their interpretation to a preferred embodiment." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001).

Second, to the extent the embodiments described in these examples cannot fit Defendants' construction, they clearly fit the undisputed scope of Claim 6 of the '956 Patent. Claim 6 depends on Claim 1, which teaches "A method of providing trace elements to a patient in need thereof, the method comprising administering an injectable trace element composition to the patient, the injectable composition comprising water, . . . 3,000 μg of zinc," and quantities of other trace elements. '956 Pat. col. 72 l. 33–37. Claim 6 recites "the method of claim 1, wherein the zinc is elemental zinc *from zinc sulfate or zinc sulfate heptahydrate*," without specifying the quantity of either compound. *Id.* col. 72 l. 62–63 (emphasis added). Therefore, Claim 6 instructs a POSA to administer an injectable composition containing 3,000 μg of zinc, supplied either through zinc sulfate or zinc sulfate heptahydrate, which all parties agree requires 7.41 mg of zinc sulfate or 13.20 mg zinc sulfate heptahydrate.[7] Indeed, as Defendants articulated at oral argument, ARI's construction, which calls for substituting the 7.41 mg of zinc sulfate with 13.20 mg of zinc sulfate heptahydrate (*i.e.*, containing an equivalent amount of elemental zinc), would therefore render Claim 12 of the '956 Patent duplicative of Claim 6. '956 Pat. col. 73 l. 27–40. (ECF No. 132 at

---

[6] Example 1 describes preparing a 1 mL injectable composition containing "zinc sulfate, USP (heptahydrate) 13.20 mg (equivalent to 3 mg zinc)[.]" '548 Pat. col. 42 l. 65–col. 44 l. 8. Examples 11 and 12 describe the formulations of Tralement and Multrys, respectively, including the amount of elemental zinc present (3 mg for Tralement and 1,000 mcg for Multrys). *Id.* col. 68 l. 63–col. 71 l. 49. Both Examples 11 and 12 teach that, in some embodiments, "[z]inc sulfate can be in a heptahydrate form having the molecular formula: $ZnSO_4 \cdot 7H_2O$ and molecular weight of about 287.54 g/mol." *Id.* col. 69 l. 12–15, l. 51–53.

[7] The Court notes Claims 1 and 6 of the '022 Patent teach the same method with substantially the same composition. '022 Pat. col. 73 l. 19–29, l. 47–52.

30:19–31:14.) Absent indicia elsewhere in the patent claims and specification, the Federal Circuit disfavors constructions with such a result. *See, e.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir. 2012) ("The fact that the two adjacent claims use different terms in parallel settings supports the district court's conclusion that the two terms were not meant to have the same meaning[.]"); *Apple Inc. v. Omni MedSci, Inc.*, Civ. A. No. 23-1034, 2024 WL 3084509, at *4 (Fed. Cir. June 21, 2024) (rejecting party's argument that claims with parallel language "except for using 'identify' versus 'detect'" made those terms "interchangeable" because "[i]t was within the patentee's power to draft" claims with the same word throughout, so reading terms to have same meaning "turns the presumption of different meanings on its head").

Moreover, there are instances where the specification uses "or" in the customary way and contradicts ARI's argument the elemental zinc is always the focus of the invention. For example, the specification describes that "[i]n various aspects, the trace elements of the compositions of this application comprise, consist essentially of or consist of zinc sulfate or zinc sulfate heptahydrate in an amount of from about 13.1 mg (13000 μg) to about 13.3 mg, . . . ." '548 Pat. col. 11 l. 1–9. This language is repeated at least twice in the specification. '548 Pat. col. 39 l. 62–col. 40 l. 4, col. 41 l. 24–26. Like with the phrasing of the claim term, this language read logically would apply the mass range provided (about 13.1 mg to about 13.3 mg) to both zinc sulfate and zinc sulfate heptahydrate. *See Wasica*, 853 F.3d at 1280. And because the amount of the compound is written as a range, it is not clear a POSA would know with certainty how much elemental zinc this embodiment contains. The ordinary English meaning and function of "or" here thus produces a more consistent and clear reading throughout the specification. *See Chef Am.*, 358 F.3d at 1373.

Additionally, Defendants present a compelling argument that the claims' amendment history during prosecution forecloses ARI's argument the claims are directed solely to the

elemental quantities, rather than the quantities of sulfate and sulfate hydrate compounds. As Defendants note, the patentees amended a precursor to the claims containing the disputed term, application claim 65, to replace specific ranges of trace elements with the language in dispute to overcome obviousness objections from the patent examiner:

> 65. (Currently Amended) An injectable trace element composition comprising water, **and as the active ingredients about 7.41 mg of zinc sulfate or zinc sulfate heptahydrate, about 0.75 mg of cupric sulfate or cupric sulfate pentahydrate, about 151 mcg of manganese sulfate or manganese sulfate monohydrate** and about 98 mcg of selenious acid ~~about 800 μg to about 4,000 μg of zinc, about 40 μg to about 400 μg of copper, about 4 μg to about 90 μg of selenium, and about 1 μg to about 80 μg of manganese~~ per 1 mL of the injectable composition, . . .

(ECF No. 112-1, Ex. E, at 5–6 (bold emphasis added).) Coupled with the evidence in the specification described above and contrary to ARI's argument, this revision indicates the patentees shifted their focus away from the quantity of elemental zinc to the quantity of zinc sulfate or zinc sulfate heptahydrate (as well as the other trace elements at issue). While ARI argues the explanation given by the patentees regarding this amendment (that the composition of these trace elements at specific doses was new to the art) does not "explain how this amendment would alter a POSA's understanding of the disputed sulfate salt and sulfate salt hydrate terms" taught in the specification (ECF No. 113 at 11–12), the Court has already found the specification does not support the understanding ARI claims a POSA would have, as it directs a POSA to read "or" in the customary way. Here, the prosecution history serves the appropriate role "by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Phillips*, 415 F.3d at 1317. In particular, the applicant's explanation that claim 65 was amended "to include the specific mineral salts or acid of the elemental active ingredients" supports the view the inventors understood the invention as related to those specific compounds. (ECF No. 112-1, Ex. F, at 12.)

Finally, ARI's authorities do not compel a different result. ARI cites *Immunex* for the proposition that claims must be construed according to the understanding of a POSA, in light of the specification, but this case is inapposite for two reasons. 977 F.3d at 1221. First, *Immunex* dealt with the meaning of a claim term, "human antibodies," *id.*, which does not contain the kind of "ordinary, simple English words" at issue here, *Chef Am.*, 358 F.3d at 1373. Second, *Immunex* involved an appeal from the Patent Trial and Appeal Board, which the Federal Circuit reviews for the "broadest reasonable construction in light of the specification of the patent," a different (and sometimes less demanding) standard than applied by district courts at claim construction, 977 F.3d at 1217. ARI also relies on *Lexion*, 641 F.3d at 1356, and *Searfoss*, 374 F.3d at 1149, but both cases are factually distinct. In *Lexion*, the Federal Circuit found the term "within" did not have its ordinary meaning because an alternative reading "harmonize[d] the various elements of the claim to define a workable invention," including several sub-limits in the same claim. 641 F.3d at 1356. By contrast, there is nothing inharmonious about giving "or" its customary meaning here, and as discussed *supra*, adopting ARI's proposed construction might create redundancy with other claims across the patents-in-suit. And unlike in *Searfoss*, there are no figures that depict a construction diverging from the ordinary usage of a common word, nor clear references throughout the specification to such an interpretation, 375 F.3d at 1149–50. Like in *Wasica* and *Chef America*, the terms in dispute hinge on "ordinary, simple English words whose meaning is clear and unquestionable." *Chef Am.*, 358 F.3d at 1373; *see also Wasica*, 853 F.3d at 1279 ("[W]ords of a claim are generally given their ordinary and customary meaning.").

Accordingly, the Court defines "about 7.41 mg of zinc sulfate or zinc sulfate heptahydrate, about 0.75 mg of cupric sulfate pentahydrate, about 151 mcg of manganese sulfate or manganese sulfate monohydrate" as "about 7.41 mg of zinc sulfate or about 7.41 mg of zinc sulfate

heptahydrate, about 0.75 mg of cupric sulfate or about 0.75 mg of cupric sulfate pentahydrate, about 151 mcg of manganese sulfate or about 151 mcg of manganese sulfate monohydrate," and "7.41 mg of zinc sulfate or zinc sulfate heptahydrate, 0.75 mg of cupric sulfate or cupric sulfate pentahydrate, 151 mcg of manganese sulfate or manganese sulfate monohydrate" as "7.41 mg of zinc sulfate or 7.41 mg of zinc sulfate heptahydrate, 0.75 mg of cupric sulfate or 0.75 mg of cupric sulfate pentahydrate, 151 mcg of manganese sulfate or 151 mcg of manganese sulfate monohydrate." The Court also defines "about 2,470 mcg of zinc sulfate or zinc sulfate heptahydrate, about 150 mcg of cupric sulfate or cupric sulfate pentahydrate, about 8.22 mcg of manganese sulfate or manganese sulfate monohydrate" as "about 2,470 mcg of zinc sulfate or about 2,470 mcg of zinc sulfate heptahydrate, about 150 mcg of cupric sulfate or about 150 mcg of cupric sulfate pentahydrate, about 8.22 mcg of manganese sulfate or about 8.22 mcg of manganese sulfate monohydrate," and "2,470 mcg of zinc sulfate or zinc sulfate heptahydrate, 150 mcg of cupric sulfate or cupric sulfate pentahydrate, 8.22 mcg of manganese sulfate or manganese sulfate monohydrate" as "2,470 mcg of zinc sulfate or 2,470 mcg of zinc sulfate heptahydrate, 150 mcg of cupric sulfate or 150 mcg of cupric sulfate pentahydrate, 8.22 mcg of manganese sulfate or 8.22 mcg of manganese sulfate monohydrate."

## IV.    CONCLUSION

For the reasons set forth above, this Court defines the disputed claim terms as defined above. An appropriate Order follows.

Date: August 13, 2025                                  */s/ Brian R. Martinotti*
                                                       **HON. BRIAN R. MARTINOTTI**
                                                       **UNITED STATES DISTRICT JUDGE**